Tshibangu Kazadi v. State of Maryland, No. 11, September Term, 2019

*VOIR DIRE* **– FUNDAMENTAL RIGHTS – PRESUMPTION OF INNOCENCE – BURDEN OF PROOF – RIGHT NOT TO TESTIFY –** *STARE DECISIS* **– SIGNIFICANT CHANGES IN LAW AND FACTS – DISCOVERY – CROSS-EXAMINATION – IMMIGRATION STATUS –** In 1964, fifty-five years ago, in Twining v. State, 234 Md. 97, 100, 198 A.2d 291, 293 (1964), Court of Appeals held that *voir dire* questions concerning jury instructions were not appropriate. Thus, *voir dire* questions concerning jurors' ability and willingness to follow jury instructions on fundamental principles of presumption of innocence, burden of proof, and defendant's right to remain silent were not permitted. Given opportunity to review this issue and upon thorough consideration of recent developments—most importantly, Court's subsequent holdings in Stevenson v. State, 289 Md. 167, 179-80, 423 A.2d 558, 565 (1980) and Montgomery v. State, 292 Md. 84, 91, 437 A.2d 654, 658 (1981), that instructions as to law are binding and not advisory only—Court determined that holding in Twining is based on outdated reasoning and has been superseded by significant changes in law.

As such, to extent that Court held in Twining that it is inappropriate to ask on *voir dire* questions concerning presumption of innocence, burden of proof, and defendant's right to remain silent, Court overruled that holding and concluded that, on request, during *voir dire*, trial court must ask whether any prospective jurors are unwilling or unable to comply with jury instructions on fundamental principles of presumption of innocence, burden of proof, and defendant's right not to testify.

Court also held that, absent additional circumstances—such as allegations of *quid pro quo* or leniency in immigration case—State's witness's status as undocumented immigrant, or person subject to deportation order, does not show character of witness for untruthfulness or demonstrate motive to testify falsely. Without more, State's witness's status as undocumented immigrant, or person subject to deportation order, is not required to be disclosed by prosecutor during discovery and is not proper subject of cross-examination.

Circuit Court for Baltimore City
Case No. 116042016
Argued: October 7, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2019

_____

TSHIBANGU KAZADI

v.

STATE OF MARYLAND

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Wilner, Alan M. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.
McDonald, Hotten, and Getty, JJ., dissent in
part.

_____

Filed: January 24, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case presents another in a series of questions about the *voir dire* process in Maryland. In recent years, this Court has addressed matters concerning the proper form of *voir dire* questions and whether certain questions, when requested, are mandatory. See Pearson v. State, 437 Md. 350, 354, 86 A.3d 1232, 1234 (2014); Collins v. State, 463 Md. 372, 379, 205 A.3d 1012, 1015-16 (2019). In this case, we must decide whether, upon request, a trial court must ask *voir dire* questions concerning a prospective juror's ability to follow jury instructions on the long-standing fundamental principles of the presumption of innocence, the burden of proof, and a defendant's right to remain silent.

Fifty-five years ago, in Twining v. State, 234 Md. 97, 100, 198 A.2d 291, 293 (1964), this Court held that a trial court need not ask during *voir dire* whether any prospective jurors would be unwilling to follow jury instructions on the presumption of innocence and the State's burden of proof. In the decades between then and now, this Court has never before expressly addressed whether Twining remains good law.

In this case, for the first time, we are explicitly asked to reexamine Twining. And, as another matter, we must also determine whether, during discovery, a prosecutor must disclose immigration-related information concerning a State's witness who is an undocumented immigrant, and whether a defendant may cross-examine such a witness concerning his or her immigration status.

In the Circuit Court for Baltimore City, the State, Respondent, charged Tshibangu Kazadi, Petitioner, with first-degree murder, use of a firearm in the commission of a crime of violence or felony, and wearing, carrying, or transporting a handgun. Kazadi requested that the circuit court ask during *voir dire* whether any prospective jurors were unwilling or

unable to follow jury instructions on the presumption of innocence, the burden of proof, and the defendant's right not to testify.  The circuit court declined to do so.

Before trial, Kazadi filed a motion to compel the State to disclose the Alien Registration Number,[1] immigration case number, and immigration-related paperwork of one of the State's witnesses, S.L., who, according to Kazadi, was an undocumented immigrant subject to a deportation order and who, along with her son, M.L.,[2] were allegedly attempting to avoid complying with the deportation order.  The State filed an opposition to the motion to compel and a motion *in limine* to preclude Kazadi from cross-examination about S.L.'s immigration status.  The circuit court denied the motion to compel and granted the State's motion *in limine*.

After being convicted, Kazadi appealed, and the Court of Special Appeals affirmed. Kazadi filed a petition for a writ of *certiorari*, which this Court granted.

Upon careful consideration of developments that have occurred in the fifty-five years since this Court decided Twining, 234 Md. 97, 198 A.2d 291—including this Court's subsequent holdings that, other than with respect to the crime charged, jury instructions are binding, see Stevenson v. State, 289 Md. 167, 179-80, 423 A.2d 558, 565 (1980), and

_____

[1]An Alien Registration Number—also known as an Alien Number, A-Number, or A#—is "[a] unique seven-, eight-[,] or nine-digit number [that is] assigned to a noncitizen by the [United States] Department of Homeland Security."  United States Citizenship and Immigration Services, Glossary, https://www.uscis.gov/tools/glossary [https://perma.cc/ 4J4A-NZKM].

[2]Like the Court of Special Appeals, we refer to S.L. and M.L. by their initials.  The Court of Special Appeals referred to one of the witnesses as "S.L.H."; we refer to her as "S.L." because, after the circuit court asked her how she preferred to be addressed, she responded: "[S.L.]"

<u>Montgomery v. State</u>, 292 Md. 84, 91, 437 A.2d 654, 658 (1981)—we determine that this Court's holding as to *voir dire* questions in <u>Twining</u> is based on outdated reasoning and has been superseded by significant changes in the law. To the extent that this Court held in <u>Twining</u> that it is inappropriate to ask on *voir dire* questions concerning the presumption of innocence, the burden of proof, and a defendant's right to remain silent, we overrule the holding in <u>Twining</u>, and conclude that, on request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the fundamental principles of presumption of innocence, the State's burden of proof, and the defendant's right not to testify.

We also hold that, absent additional circumstances—such as evidence of a *quid pro quo* arrangement or allegations of leniency in an immigration case—a State's witness's status as an undocumented immigrant, or the existence of a deportation order applicable to the witness, do not show the character of the witness for untruthfulness or demonstrate a motive to testify falsely. Without more, a State's witness's status as an undocumented immigrant, or any deportation order to which the witness is subject, are not required to be disclosed by a prosecutor during discovery, and are not proper subjects of cross-examination.

## BACKGROUND

### *Voir Dire*

On January 17, 2017, jury selection occurred. On that date, Kazadi's counsel provided the circuit court with a document that was entitled "Defendant's Proposed Voir Dire[,]" and that included the following questions:

- 3 -

The Court will instruct you that the State has the burden of proving the Defendant guilty of the offenses charged beyond a reasonable doubt. Are there any of you who would be unable to follow and apply the Court's instructions on reasonable doubt in this case?

Is there any member of the [] jury panel who would hesitate to render a verdict of not guilty if you had hunch that the Defendant had committed the alleged crime, but were not convinced of that fact beyond reasonable doubt?

The Court will instruct you that the Defendant is presumed of be innocent of the offenses charged throughout the trial unless and until the Defendant is proven guilty beyond a reasonable doubt. Is there any member of the jury panel who would be unable to give the Defendant the benefit of the presumption of innocence?

Under the law[,] the Defendant has an absolute right to remain silent and to refuse to testify. No adverse inference or inference of guilt[] may be drawn from the refusal to testify. Does any prospective juror believe that the Defendant has duty or responsibility to testify[,] or that the Defendant must be guilty merely because the Defendant may refuse to testify?

(Numbers omitted). Kazadi's counsel requested that the circuit court ask the four questions during *voir dire*. The circuit court declined, stating: "Those are covered adequately in the instruction portion of the case and I think are covered in other questions that [I] ask."

During *voir dire*, after asking questions of the jury panel, the circuit court asked counsel whether there were any objections. Kazadi's counsel stated that he wanted the circuit court to ask the questions in his proposed *voir dire* that the court had declined to give. The circuit court responded: "[Y]ou've preserved your objection[.]"

**Motion to Compel, Motion *in Limine*, and Motion to Suppress**

On December 8, 2016, Kazadi filed a "Motion to Compel Discovery." (Some capitalization omitted). In the motion to compel, Kazadi advised that one of the State's witnesses, S.L., had provided a statement in which she said "that she was hesitant to come

- 4 -

forward with information because she was worried about an outstanding deportation order[.]" Kazadi's counsel requested from the prosecutor, but was not provided, S.L.'s Alien Registration Number, "her immigration case number, and any paperwork [that] she ha[d] regarding her immigration status, including a copy of the deportation order[.]" Kazadi's counsel met with S.L. and the prosecutor, who instructed S.L. not to disclose her Alien Registration Number or answer any questions about the deportation order. Kazadi contended that the deportation order gave S.L. and her son, M.L., a motive to testify against Kazadi, in that their testimony could make them eligible for relief from deportation. Kazadi argued that S.L.'s and M.L.'s alleged noncompliance with the deportation order demonstrated a character trait of untruthfulness.

On December 22, 2016, the State filed an Opposition to Defendant's Motion to Compel Discovery and State's Motion *In Limine*. The State contended that it was not obligated to comply with the discovery requests for immigration-related information because the State had not promised S.L. that she would receive special treatment in exchange for her cooperation. The State argued that Kazadi had provided no evidence that S.L. was attempting to evade the deportation order. The State asserted that Kazadi's "speculation should not serve as a basis for a fishing expedition into [S.L.'s] immigration status[.]"

Addressing the motion *in limine*, the State requested that the circuit court preclude Kazadi from cross-examining S.L. about her immigration status. The State contended that information about a witness's immigration status is admissible only where there is a connection between the witness's immigration status and a motive to fabricate testimony.

The State argued that S.L. had no such motive as she had no connection to the murder, apart from being a witness who decided to come forward with material information.

On January 13, 2017, the circuit court issued a "Memorandum and Discovery Order[,]" denying the motion to compel and reserving on the motion *in limine* for a ruling by the circuit court judge who would preside over the trial. (Some capitalization omitted). The circuit court concluded that, without a showing by Kazadi of some "special relationship" between S.L. and the State as to immigration, or a promise, inducement, or benefit that the State extended concerning immigration, Kazadi failed to show a basis to compel disclosure of the requested information. The circuit court noted that Kazadi had not identified any promise or inducement that the State extended to S.L. or M.L. in connection with S.L.'s immigration status. The circuit court explained that, seemingly, Kazadi wanted to attempt to confirm the information that S.L. had provided with some hope that it might develop into a credibility issue.

Before the start of trial, the circuit court conducted a hearing on a motion to suppress any in-court identification of Kazadi by S.L. or M.L. At the hearing, S.L. and M.L. testified through an interpreter. Neither S.L. nor M.L. testified concerning any immigration-related matters. S.L. testified that she did not expect any benefit in exchange for testifying, and that, apart from requesting and receiving moving expenses and rent for a new home, she had neither requested nor received any benefits from the Office of the State's Attorney for Baltimore City. M.L. testified that he had not thought that he or his relatives would receive any benefit in exchange for speaking to law enforcement officers.

After S.L. and M.L. testified, the circuit court denied the motion to suppress. Before the circuit court heard argument on the motion *in limine*, the following exchange occurred:

> THE COURT: I've not heard anything from [S.L. and M.L.] indicating to me that there is an immigration issue that would have been factor in them testifying. But[,] obviously[,] if you have an argument to make on that point[,] I would love to hear it.
>
> [KAZADI'S COUNSEL]: Okay.
>
> THE COURT: And let me tell you, I have significant concern about -- and we have no idea how this jury's going to react -- there is some level of hostility in some circles in our society to people who are perceived as being here illegally. Whether that is valid or not valid, I don't want to be in situation where we prejudice a jury by raising an issue [that] may not be germane to the case. Obviously[,] if it is germane to the case, if they've been promised to stay in the U.S. indefinitely while they were, you know, in exchange for testimony[,] that obviously is a very valid factor[,] and in which case the prejudice is something that would not be outweighed. But I'm open to hear whatever you may have to say about that.

Kazadi's counsel stated that law enforcement officers had interviewed S.L., who said that one of the reasons why she did not come forward sooner was that she was subject to a deportation order. The circuit court asked whether there was any evidence of "quid pro quo for immigration status." Kazadi's counsel responded that S.L.'s social worker told her that the Baltimore Police Department would not enforce the deportation order. The prosecutor and the circuit court observed that there had not been any testimony to that effect. The following exchanges occurred:

> THE COURT: [U]nless you have something more concrete about her immigration status[,] I am really concerned about putting into the record possibly that [S.L.] is an illegal immigrant -- an undocumented alien, if you will[,] or that [M.L.] is[,] given the fact that there is, as I say, among circles in our society[,] strong bias, prejudice, in fact, even among people [whom] I know socially[,] against people who are undocumented aliens. And I don't want to -- I think [that] it's legitimate to pursue areas of legitimate inquiry

on cross[-]examination. [Kazadi] has a right to that[,] and that's your obligation. But[,] by the same token[,] I don't want to get into areas that I think are going to shed more heat than light. This is one. So unless you can make a proffer to me, let's say tomorrow[,] when [S.L.] comes on to testify[ at trial,] that you've got something that would constitute something -- quid pro quo on the immigration status[,] I'm uncomfortable with letting that in. I truly am.

\* \* \*

[KAZADI'S COUNSEL]: [T]here's a difference between having a deportation order and being an illegal immigrant because there are many legal immigrants or legal visitors to this country who could be ordered deported. I mean, and then they become -- they kind of --

THE COURT: They become illegal if they overstay.

[KAZADI'S COUNSEL]: Far --

THE COURT: Well, even the, you know, you're, again, I mean, the -- you've raised another aspect of this, okay. So[,] that may be true[,] but that doesn't help much either because[,] why do you get deported? People who know -- who follow these things will know [that] one of the reasons [why] you get deported is you're found guilty of a crime of some type. And you know that there's significant limitations on the ability to use history of [prior] bad acts for impeachment. And we don't know that anything that [S.L.] did, if there was something [that] she did, and we don't know what she may have done, we don't know that any of that has anything to do with honesty or a likelihood to lie on the stand. And there's no evidence of the quid pro quo. So she's being asked to leave because, you know, she was picked up for, you know, possession of heroin, let's say. Yeah, that's a bad thing, but that's not an impeachable offense, basically. So that would also concern me a little bit, that, you know, I don't want to -- I mean, I think you have a right, obviously, to question these witnesses as to what they saw[,] and when they saw it[,] and the circumstances[,] and all that. And[,] if they have a motive to bias, I would -- sure. You know, if you were going to argue that it's -- this is the result of neighborhood feud[,] and not a result of the witness of a crime, I mean, sure, that's fine. But I really am uncomfortable with the notion that we're going to put into the record the existence of deportation order[,] or the suggestion of a quid pro quo[,] without some stronger evidence that that is[,] in fact[,] the case because I think [that] there's an impermissible level of prejudice that could result from her if that were to happen.

- 8 -

[KAZADI'S COUNSEL]: I guess I would have two responses. One, I think [that] the act of evading a deportation order is itself evidence of deceit[,] much like -- analogous to the way that the Court of Appeals has said drug dealers necessarily are surreptitious[,] and that's --

THE COURT: Boy, I sure don't buy the notion that a family who comes to America to try to make something of themselves[,] and get their kids in school[,] is equivalent to a drug dealer.

[KAZADI'S COUNSEL]: No, I -- that's not --

THE COURT: I mean, I'm not saying it's legal, but I'm saying, boy, it -- the one is really understandable[,] and the one really is a pox on the community.

[KAZADI'S COUNSEL]: Well, I would say [that] I'm -- it's not just that they came here illegally. It's that they were told to leave[,] and didn't. And I think [that] that's what makes it different.

THE COURT: Well, it may be under, you know, I mean, again, if there's an appeal[,] and if they're -- I mean, it just -- I just, you know, we're not going to do an immigration trial here in this court as part of this criminal case. And again, as I said, think that this is one of those circumstances in which the equities think really militate against allowing that particular thing to become an issue in [this] case. Now, if it turns out that you can come up with something that makes it more than a speculation that there's a quid pro quo, and obviously that's legitimate. But[,] I'm not hearing it. And[,] unless you come up with something [that] you can show me out of the hearing of the jury to indicate that there is more to this than just a notion, I just think [that] it would be unfairly prejudicial to [S.L.]

At the conclusion of the hearing, the circuit court granted the motion *in limine*, and stated:

"As I said, if you discover something that is relevant and that is concrete, I am open to changing my mind. Based on what I know at this moment, however[, t]hat's my ruling."

### S.L.'s and M.L.'s Trial Testimony[3] and Verdicts

On January 18, 2017, at trial, as a witness for the State, through an interpreter, S.L.

---

[3]Because the other State's witnesses' trial testimony is not relevant to the issues that are before this Court, we summarize only S.L.'s and M.L.'s trial testimony.

testified that, in August 2015, she and her son, M.L., lived in Baltimore City near Kazadi. On August 18, 2015, S.L. sent M.L. outside of their house to retrieve trashcans. While M.L. was outside, S.L. heard four or five gunshots. S.L. went outside and saw M.L. running toward her. M.L. said that "the guy had killed someone." S.L. saw Kazadi hide a gun and run into his basement. S.L. looked in the alley and saw a man who had been shot. Kazadi's mother and sister, who lived with him, came out of their house and spoke to S.L., who told them that she had seen Kazadi shoot the victim. Law enforcement officers came to S.L.'s house, but she did not speak with them because she was afraid. The prosecutor asked S.L. why she was afraid. S.L. responded: "Because they realized that we had said that [Kazadi] was the one [who] had killed [the victim]." For months, S.L. continued to live near Kazadi. On January 19, 2016, S.L. spoke to a detective, and identified Kazadi as the person who "killed the [victim]" in a photographic array.

After S.L.'s direct-examination, at a bench conference, the prosecutor stated that there had been "no additional evidence . . . with regards to the immigration issue." Kazadi's counsel disagreed, contending that, although S.L. had testified that she did not come forward sooner because she was afraid of Kazadi, she had previously told law enforcement officers that she did not come forward sooner because of "fear of immigration[.]" The following exchanges occurred:

> THE COURT: I ruled yesterday, and I really am concerned about this[.] I don't want to get this jury upset with [S.L.] possibly being here without documents. And I just really am concerned about that. What I will allow you to do is ask [whether] she gave a different reason. So she said she was - - what did she say? She was afraid of being deported.
>
> [KAZADI'S COUNSEL]: Yes, because she has an outstanding --

- 10 -

[THE PROSECUTOR]: She said she[] was scared.  And then[,] when they sort of flushed it out[,] that's when the additional part of the documentation issue came out.  But she had initially indicated that she was scared for her safety and the safety of her children.  So that is consistent.

THE COURT: Mm-hmm.

[THE PROSECUTOR]: I obviously didn't go any further because of the Court's order.

THE COURT: No, I know.  So[,] if you go in[,] you're trying to prove what, that she's lying?

[KAZADI'S COUNSEL]: Right.  Well, one, I don't -- one, when she was given a chance to say why she was afraid, one, she didn't say because she felt threatened.  And, two, because she said something else.  Because[,] right now[,] the jury thinks that [Kazadi]'s family was threatening her the entire time.

THE COURT: I know they certainly -- well, I don't know if they thin[k] --

[KAZADI'S COUNSEL]: Or could[.]  I don't know if they think that.  Correct.

THE COURT: I mean, yeah.  I think[ that] she didn't say that they were threatening her, what she said was[: "]I lived next door to the guy [whom] I was going to finger.["]  So they can assume that that probably is not a good thing to do.  Not a safe thing to do.  It's a good thing to do.
     Well[,] I don't know how one does that and avoid[s] bringing up the fact that she possibly is undocumented.  And I really am uncomfortable having that come out.  I'm really absolutely uncomfortable, particularly when there's no indication[,] and she specifically testified[, that] she got no quid pro quo, [and] you have no concrete evidence that there was a quid pro quo.  And the inconsistency[,] I don't think[,] is material[,] qui[te] honestly.  I'm not going to permit it[,] and if I'm wrong[,] I'm wrong.  But --

[KAZADI'S COUNSEL]: So I can't get into it at all?  Not even like[,] she gave a different reason?

THE COURT: I would allow that, but I want to keep a tight rein on this[,] as I said.  And the reason is, quite honestly, there is an atmosphere of intolerance out there about people who are here in an undocumented capacity, who are

- 11 -

illegal.  And[,] some people[,] it doesn't make a big difference to.  I don't honestly think it goes to credibility[,] particularly.  And I don't want to have a jury be prejudiced against [S.L.]  Yeah, I'm going to allow you to ask if there's an inconsistent reason.  If you get into the question of immigration[,] then [the prosecutor] will object[,] and I will likely sustain it.

[THE PROSECUTOR]: Okay.

[KAZADI'S COUNSEL]: All right.

THE COURT: If you feel that there's an inconsistent reason, you can ask[: "Y]ou didn't blame it on the family[?"]  I think that's a legitimate issue for you to explore.  I don't have a problem with that.

[THE PROSECUTOR]: Your Honor, my concern is that [Kazadi's c]ounsel will follow up with [--] is that other inconsistent reason [--] the fact that, you know, you have deportation order.  You can't unring that bell.

THE COURT: Well, you're not going to do that.

[KAZADI'S COUNSEL]: I figured [that] I couldn't do that.

THE COURT: Yeah, thank --

[KAZADI'S COUNSEL]: I mean, I would like to do that, but I'm assuming that the order was that I could not do that.

THE COURT: Yeah[.]

During S.L.'s cross-examination, the following exchanges occurred:

[KAZADI'S COUNSEL: W]hen you talked to [the police] in January, they asked you why you didn't come forward initially.

[S.L.:] Because I was scared.

[KAZADI'S COUNSEL:] Okay. And I'm going to ask you this question very carefully.  But[,] at the time[,] you didn't tell the police that you were scared of [] Kazadi or his family[.  Y]ou told them [that] you were scared of something else, correct?

[S.L.:] Yes.

- 12 -

* * *

[KAZADI'S COUNSEL:] The other thing that you're scared of is not connected to [] Kazadi or his family?

[S.L.:] I said -- I said both. I said why I was worried.

* * *

[KAZADI'S COUNSEL:] You remember talking to the police and it being recorded in January, right? Now[,] I'm going to show you something that I had prepared about what you said. . . . [T]his is the part where you're talking to the police about what you're afraid of. . . . [Y]ou talk about the other thing, not [] Kazadi or his family, correct?

[S.L.:] I repeat again, I spoke about both. I was afraid of his family and something else.

[KAZADI'S COUNSEL:] Okay. I guess [--] why don't you just read the next page. And[,] at that point[,] you still just continue to talk about something else[,] and not [] Kazadi or his family?

[S.L.:] Yes, I said that.

As a witness for the State, through an interpreter, M.L. testified that, on August 18, 2015, he retrieved trashcans that were behind his house. As M.L. was walking back to his house, he heard a gunshot. M.L. turned and saw Kazadi and another man in the alley. Kazadi was holding a revolver. The other man said: "[C]hill." Kazadi shot the other man two or three times, then ran toward the back of his house. M.L. saw his mother, S.L., at the back door of their house and told her what he had seen. M.L. did not speak to law enforcement officers that night because he was "afraid" and "in shock." Eventually, however, M.L. spoke to detectives, and identified Kazadi as the shooter in a photographic array.

During M.L.'s cross-examination, Kazadi's counsel requested a bench conference,

which the circuit court granted. At the bench conference, Kazadi's counsel stated that he wanted to ask "immigration-related questions," but he was not going to do so "based on the Court's earlier order." The circuit court responded: "[T]he questions are ruled out as far as the immigration question."

The State entered a *nolle prosequi* on the remaining charge of wearing, carrying, or transporting a handgun. The jury found Kazadi not guilty of first-degree murder, but guilty of second-degree murder and use of a handgun in the commission of a crime of violence.

## Opinion of the Court of Special Appeals

Kazadi appealed. On February 4, 2019, the Court of Special Appeals affirmed Kazadi's convictions. See Kazadi v. State, 240 Md. App. 156, 162, 201 A.3d 618, 622 (2019). The Court of Special Appeals held that the circuit court did not abuse its discretion in declining to ask *voir dire* questions concerning jury instructions. See id. at 164, 201 A.3d at 623. The Court of Special Appeals concluded "that *Twining* is still controlling" because, "[c]ontrary to [Kazadi]'s contention, the Court of Appeals has affirmed the continuing vitality of *Twining*[.]" Kazadi, 240 Md. App. at 168, 201 A.3d at 625.

The Court of Special Appeals held that the circuit court did not err or abuse its discretion in denying the motion to compel. See id. at 183, 201 A.3d at 634. The Court of Special Appeals determined that, "[a]bsent any evidence of an immigration-related quid pro quo indicating a bias or motive to testify falsely, [the motion to compel] amounted to a fishing expedition for information that would not be admissible to impeach [S.L.]" Id. at 183, 201 A.3d at 634. The Court of Special Appeals noted that there was no link between the deportation order or S.L.'s and M.L.'s immigration status and their identification of

- 14 -

Kazadi as the killer.  See id. at 183, 201 A.3d at 634.

The Court of Special Appeals concluded that the circuit court did not abuse its discretion in precluding cross-examination of S.L. and M.L. about their immigration statuses.  See id. at 188, 201 A.3d at 637.  The Court of Special Appeals explained:

> From the initial written pleadings, to the pretrial suppression hearing, to the trial, this record is devoid of any evidence that S.L.[] or M.L. received or expected an immigration-related benefit as a result of either their [pretrial] identification[s] of [Kazadi] or their testimony against him. . . . To the contrary, the prosecutor insisted [that] she had never discussed immigration status with S.L.[]  At the suppression hearing before trial, S.L.[] testified that the only benefit [that] she received was relocation expenses, which were not tied to the family's immigration status.  She maintained that she did not expect any benefit for coming forward to identify [Kazadi] or testify against him.  Her trial testimony was consistent on that point.
>
> Absent any link between [S.L.'s and M.L.'s] immigration status and their credibility, the [circuit] court did not abuse its discretion in foreclosing cross-examination of S.L.[] and M.L. about immigration matters.  Significantly, the [circuit] court's ruling only disallowed cross-examination about immigration status, without preventing [Kazadi's] counsel from asking whether S.L.[] hoped to receive any other benefit from her testimony, such as relocation expenses.  Accordingly, [Kazadi]'s concern that S.L.[]'s testimony was influenced by her immigration status was simply speculative, and evidence of her immigration status – if relevant at all to her bias and partiality – would have had very little probative value.
>
> As alternative grounds for affirming the [circuit] court's decision to restrict cross-examination, we hold that the [circuit] court did not abuse its discretion in ruling, pursuant to [Maryland] Rule 5-403, that questioning S.L.[] and M.L. about their immigration status and/or the deportation order would unfairly prejudice the jury by introducing the possibility of invidious discrimination on the basis of alienage.  As the [circuit] court emphasized, such evidence had a significant potential both to prejudice jurors against the [State's] witnesses and to confuse jurors by injecting unrelated immigration issues involving mere bystanders into this murder trial against [Kazadi].

Id. at 186-87, 201 A.3d at 636-37 (cleaned up).

## Petitions for a Writ of *Certiorari*

On March 12, 2019, on his own behalf, Kazadi petitioned for a writ of *certiorari*.

On March 26, 2019, on Kazadi's behalf, his appellate counsel petitioned for a writ of *certiorari*, raising the following three issues:

> 1.  Is a criminal defendant entitled, upon request, to *voir dire* questions aimed at identifying prospective jurors who are unable or unwilling to apply the principles that the State has the burden of proving the defendant guilty beyond a reasonable doubt, that the defendant is presumed innocent[,] that the defendant has the right to remain silent and refuse to testify[,] and that no adverse inference may be drawn from the defendant's silence?
>
> 2.  Where a critical State's witness reveals pretrial that she and her minor son (also a witness) are subject to a deportation order, must the State provide in discovery the witness's Alien [Registration] Number and a copy of the deportation order so that defense counsel may identify potential impeachment evidence as described in Maryland Rules 5-608[](b) and 5-616[](a)[](4)?
>
> 3.  Where defense counsel has a good-faith basis to believe that critical State's witnesses are the subject of a deportation order, is defense counsel entitled to cross-examine those witnesses about their immigration issues pursuant to Maryland Rules 5-608[](b) and 5-616[](a)[](4), the Sixth Amendment to the United States Constitution[,] and Article 21 of the Maryland Declaration of Rights?

(Footnote omitted). On April 25, 2019, on his own behalf, Kazadi supplemented the petition that he had filed. On May 14, 2019, this Court granted the petition that Kazadi's appellate counsel had filed, and denied the petition and supplement that Kazadi had filed on his own behalf. See Kazadi v. State, 463 Md. 637, 207 A.3d 1215 (2019).

## DISCUSSION

### I. *Voir Dire*

#### The Parties' Contentions

Kazadi contends that, on request, a defendant is entitled to *voir dire* questions concerning prospective jurors' willingness and ability to follow jury instructions on the

presumption of innocence, the State's burden of proof, and the defendant's right not to testify. Kazadi argues that a prospective juror who is unwilling or unable to honor these fundamental rights has a bias or misconception that constitutes a specific cause for disqualification. Kazadi asserts that there is no valid reason why *voir dire* questions concerning these three fundamental principles should continue to be considered inappropriate in Maryland. Kazadi maintains that contrary to this Court's holding in Twining, *voir dire* is the most appropriate time to question prospective jurors as to whether they would be able or willing to follow jury instructions regarding the State's burden of proof, the presumption of innocence, and the defendant's right to remain silent. Kazadi essentially maintains that Twining should be overruled.

The State responds that we should decline to overrule this Court's holding in Twining, under which trial courts are not required to ask *voir dire* questions concerning jury instructions. The State contends that Kazadi has not shown that Twining is subject to an exception to the doctrine of *stare decisis*. The State argues that Twining was not clearly wrong and contrary to established principles because, in Twining, this Court followed the lead of the majority of courts in other jurisdictions. The State asserts that Twining has not been superseded by significant changes in the law or the facts because this Court recently reaffirmed its holding in State v. Logan, 394 Md. 378, 906 A.2d 374 (2006) and Stewart v. State, 399 Md. 146, 923 A.2d 44 (2007).

## Standard of Review

"An appellate court reviews for abuse of discretion a trial court's decision as to whether to ask a *voir dire* question." Pearson, 437 Md. at 356, 86 A.3d at 1235 (citation

- 17 -

omitted).

**Maryland Case Law on Jury Instructions, *Voir Dire*, and *Stare Decisis***

Since 1851, the Constitution of Maryland has included the following language: "In the trial of all criminal cases, the jury shall be the judges of law as well as fact."  See Stevenson, 289 Md. at 173 & n.3, 423 A.2d at 561 & n.3.[4]  For more than a century after 1851, it was common practice for trial courts to instruct jurors that they were the judges of both the law and the facts, and that the jury instructions were "advisory only."  For example, in Vogel v. State, 163 Md. 267, 269, 162 A. 705, 705 (1932), a trial court instructed a jury: "Under the laws of Maryland[,] you are judge[s] of the law and of the evidence in a criminal case.  Any instruction to you by the Court as to the law is, therefore, advisory only and not binding on you."  (Cleaned up).

In 1964, with "advisory only" jury instructions being the common practice, in Twining, 234 Md. at 100, 198 A.2d at 293, this Court held that a trial court did not abuse its discretion in declining a defendant's request to ask during *voir dire* whether the prospective jurors "would give the [defendant] the benefit of the presumption of innocence and the burden of proof."  This Court reasoned:

> The rules of law [that were] stated in the proposed questions were fully and fairly covered in subsequent instructions to the jury.  It is generally recognized that it is inappropriate to instruct on the law [during *voir dire*], or to question the [prospective jurors] as to whether or not they would be

---

[4]This language was in Article X, Section 5 of the Constitution of Maryland of 1851; Article XII, Section 4 of the Constitution of Maryland of 1864; and, initially, Article XV, Section 5 of the Constitution of Maryland of 1867.  See Stevenson, 289 Md. at 173 & n.3, 423 A.2d at 561 & n.3.  In 1978, this language was recodified in Article 23 of the Declaration of Rights within the Constitution of Maryland of 1867, see id. at 173 n.3, 423 A.2d at 561 n.3, where it remains today.

> disposed to follow or apply stated rules of law. See 50 C.J.S. Juries § 275(2). This would seem to be particularly true in Maryland, where the [jury] instructions are only advisory.

Id. at 100, 198 A.2d at 293.

Sixteen years after deciding Twining, in Stevenson, 289 Md. at 169, 189, 423 A.2d at 559, 570, this Court held that, although on its face, the language "[i]n the trial of all criminal cases, the jury shall be the judges of law as well as fact"—which, by then, was in Article 23 of the Declaration of Rights—did not violate the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, case law demonstrated that Article 23 did not grant a jury "the power to decide all matters that may be correctly included under the generic label 'law.' Rather, [a jury's] authority is limited to deciding the law of the crime, or the definition of the crime, as well as the legal effect of the evidence before the jury." Id. at 178, 423 A.2d at 564 (cleaned up). This Court observed: "Implicit in the decisions of this Court limiting the jury's judicial role to the law of the crime is a recognition that all other legal issues are for the [trial court] alone to decide." Id. at 179, 423 A.2d at 565 (cleaned up). This Court cautioned that a trial court must make clear to a jury that, other than the law of the crime, "all other aspects of law (e.g., the burden of proof, the requirement of unanimity, the validity of a statute) are beyond the jury's pale, and that the [jury instruction]s on these matters are binding upon that body." Id. at 180, 423 A.2d at 565.

The following year, in Montgomery, 292 Md. at 91, 437 A.2d at 658, this Court held that a trial court erred in instructing a jury that it "could pay no attention to instructions on the law [that] did not pertain to the elements of the crime[,] but which were standard

- 19 -

instructions [that were] invoked to preserve the integrity of the judicial system and to assure the defendant a fair and impartial trial." In <u>Montgomery</u>, <u>id.</u> at 90, 437 A.2d at 657, the trial court had stated: "I, therefore, instruct you in an advisory capacity that[,] in any criminal case you will sit on[,] the law places the burden on the State of Maryland to prove that a defendant is guilty beyond what we call a reasonable doubt." (Ellipsis omitted). This Court observed that fundamental rights, such as the presumption of innocence, the burden of proof, and the right not to testify, "are not the law of the crime; they are not advisory; and they cannot be the subject of debate by counsel before the jury. They are binding. They are the guidelines of due process to which every jury is required to adhere." <u>Id.</u> at 91, 437 A.2d at 658 (internal quotation marks omitted).

Before today, this Court mentioned <u>Twining</u> by name in only one case—<u>Logan</u>, 394 Md. at 399-400, 906 A.2d at 386-87. In <u>Logan</u>, <u>id.</u> at 398, 906 A.2d at 386, this Court held that a trial court did not abuse its discretion in declining a defendant's request to ask *voir dire* questions concerning the defense of not criminally responsible. One of the requested *voir dire* questions was: "If the defendant satisfies his burden in this regard, will any member of the jury be unable to find the defendant not criminally responsible?" <u>Id.</u> at 398, 906 A.2d at 386. This Court determined that this *voir dire* question "amount[ed] to a solicitation of whether prospective jurors would follow the [jury] instructions. . . . This practice is generally disfavored in Maryland[.]" <u>Id.</u> at 398-99, 906 A.2d at 386 (citing <u>Twining</u>, 234 Md. at 100, 198 A.2d at 293). Another requested *voir dire* question was: "Does any juror anticipate having difficulty following the [jury] instructions on the defense of 'not criminally responsible,' particularly in view of the crimes charged in the

indictment?" <u>Logan</u>, 394 Md. at 399, 906 A.2d at 387. This Court determined that this *voir dire* question was also unnecessary, explaining: "As we made clear in *Twining*, 234 Md. at 100, 198 A.2d at 293, voir dire is not the appropriate time for the trial [court] to instruct the jury on the law [that is] applicable to the case." <u>Logan</u>, 394 Md. at 399-400, 906 A.2d at 387.

The following year, in <u>Stewart v. State</u>, 399 Md. 146, 165, 153, 923 A.2d 44, 55, 48 (2007), relying on <u>Logan</u>, this Court held that a trial court did not abuse its discretion in declining to ask during *voir dire* whether any prospective jurors would treat the indictment as evidence of guilt, or whether any prospective jurors had "any quarrel with" the presumption of innocence and the burden of proof. This Court reasoned that the *voir dire* questions "addressed matters of law, and[,] as such, were not the proper subject of voir dire." <u>Id.</u> at 165, 923 A.2d at 55. This Court stated: "[Q]uestions asking whether prospective jurors would follow the [jury] instructions . . . are disfavored in Maryland[,] and a court does not abuse its discretion in refusing to ask them." <u>Id.</u> at 162-63, 923 A.2d at 53-54 (citing <u>Logan</u>, 394 Md. at 399, 906 A.2d at 386).

In multiple cases, relying on <u>Twining</u>, 234 Md. at 100, 198 A.2d at 293, the Court of Special Appeals has held that trial courts did not abuse their discretion in declining to ask during *voir dire* whether the prospective jurors understood certain legal principles. As one example, in <u>Scott v. State</u>, 49 Md. App. 70, 74, 430 A.2d 615, 618 (1981), without specifying the *voir dire* questions at issue, the Court of Special Appeals held that a trial court did not abuse its discretion in declining to ask *voir dire* questions that were aimed at "whether the prospective jurors would apply proper legal principles." And, in <u>Baker v.

- 21 -

State, 157 Md. App. 600, 618, 853 A.2d 796, 806 (2004) and Marquardt v. State, 164 Md. App. 95, 141, 144, 882 A.2d 900, 927, 929, cert. denied, 390 Md. 91, 887 A.2d 656 (2005), the Court of Special Appeals observed: "[I]t is up to the Court of Appeals, not this Court, to decide, as [the defendant] suggest[ed], that the reasoning of *Twining* is 'now outmoded.'"

The doctrine of *stare decisis* frames the issue of whether this Court should overrule its holding as to *voir dire* in Twining. Under the doctrine of *stare decisis*—Latin for "to stand by things [that are] decided"—generally, "a court must follow earlier judicial decisions when the same points arise again in litigation." *Stare Decisis*, Black's Law Dictionary (11th ed. 2019). That said, "stare decisis is not absolute." Meyer v. State, 445 Md. 648, 669, 128 A.3d 147, 159 (2015) (cleaned up). Under two exceptions to *stare decisis*, an appellate court may overrule a case that either was "clearly wrong and contrary to established principles[, or] has been superseded by significant changes in the law or [the] facts." Wallace v. State, 452 Md. 558, 582, 158 A.3d 521, 535 (2017) (cleaned up). The second exception to *stare decisis* applies "where changed conditions or increased knowledge have rendered the appellate court's precedent unsound in the circumstances of modern life, a vestige of the past, and no longer suitable to the people." Id. at 582, 158 A.3d at 535 (cleaned up).

**Other Jurisdictions' Laws on *Voir Dire* Questions Concerning Fundamental Rights**

Courts in other jurisdictions have addressed the question of whether, on request, during *voir dire*, a trial court must ask the prospective jurors whether they are willing and able to follow the jury instructions on the presumption of innocence, the burden of proof,

and/or the defendant's right not to testify.

In 2005, in <u>Hayes v. Commonwealth</u>, 175 S.W.3d 574, 586 (Ky. 2005), the Supreme

Court of Kentucky held that a trial court abused its discretion in refusing to allow the

defendants' "counsel to ascertain during voir dire whether any of the prospective jurors

would hold against them the fact that they exercised their [] privilege not to testify[.]" The

Court explained:

> If any [prospective] jurors . . . had expressed [] a prejudice[ against
> defendants who do not testify], the trial court would have been required to
> strike those [prospective] jurors for cause. But how could defense counsel
> identify [prospective] jurors [who were] holding such prejudice if defense
> counsel is precluded from making the relevant inquiry on voir dire? By
> limiting the voir dire to exclude any inquiry into that issue . . . , the trial court
> prevented them from identifying any [prospective] jurors [who were] so
> prejudiced[,] and thereby precluded the exercise of possible challenges for
> cause[.]

<u>Id.</u> at 585.

In <u>People v. Zehr</u>, 469 N.E.2d 1062, 1063-64 (Ill. 1984), the Supreme Court of

Illinois held that a trial court erred in declining to ask during *voir dire* whether the

prospective jurors understood the presumption of innocence, the burden of proof, and the

defendant's right not to testify. The Court explained:

> [E]ssential to the qualification of jurors in a criminal case is that they know
> that a defendant is presumed innocent, that he [or she] is not required to offer
> any evidence [o]n his [or her] own behalf, that he [or she] must be proved
> guilty beyond a reasonable doubt, and that his [or her] failure to testify [o]n
> his [or her] own behalf cannot be held against him[ or her]. If a juror has a
> prejudice against any of these basic guarantees, a[ jury] instruction [that is]
> given at the end of the trial will have little curative effect. It is also vital to
> the selection of a fair and impartial jury that a juror who finds that the State
> has failed to sustain its burden of proof of guilt beyond a reasonable doubt
> have no prejudices against returning a verdict of not guilty. . . . [E]ach of
> [the] questions [that the defendant requested] goes to the heart of a particular

bias or prejudice which would deprive [the] defendant of his right to a fair and impartial jury[.]

Id. at 1064 (cleaned up).[5]

In State v. Cere, 480 A.2d 195, 198 (N.H. 1984), the Supreme Court of New Hampshire held that, "in all future criminal trials," the following *voir dire* questions were required to be asked:

> Do you believe that because the defendant has been charged with a crime, he (she) is probably guilty and therefore must present evidence to prove that he (she) is innocent?
>
> If you have such a belief, would that belief prevent you from accepting from this court and applying to this case the correct formulation of law; that is, that a defendant is presumed innocent until proven guilty, that the State has the burden of proving guilt beyond a reasonable doubt, and that the defendant need present no evidence whatsoever on his own behalf?

The Court explained that multiple sources

> indicate[d] a shockingly widespread ignorance of those valued precepts [that are] most central to our American system of criminal justice[—]a defendant's presumption of innocence and the government's burden of proving guilt beyond a reasonable doubt. In light of this apparently widespread misinformation about those precious protections [that are] afforded by our legal system, we are compelled to take action [] to ensure, as

---

[5]After deciding Zehr, 469 N.E.2d 1062, the Supreme Court of Illinois adopted an amendment to an Illinois rule that codified the Court's holding in Zehr. See IL R S CT Rule 431 cmt. Today, IL R S CT Rule 431(b) states in pertinent part:

> The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

much as possible, that those persons [who are] serving as jurors are aware of, understand, and can implement those constitutional requirements relating to the presumption of innocence and the burden of proof.

Id.

In State v. Hayes, 364 So.2d 923, 925, 924 (La. 1978), the Supreme Court of Louisiana held that a trial court erred in sustaining a prosecutor's objection to the following question, which a defendant's counsel asked during *voir dire*: "[D]o any of you feel that you want to hear [the defendant's] side of the story?" Immediately before that, the defendant's counsel had told the prospective jurors: "[T]he defendant is not required to take the witness stand in his own behalf[,] and we will tell you[,] and the [trial court] will tell you in the [jury instructions], that you can't hold this against him." Id. at 924. On appeal, the defendant contended "that the defendant's right to silence is a difficult one for the jurors to understand because it goes against a natural desire to hear all sides of a story, and that some jurors might have difficulty according the presumption of innocence to the silent defendant." Id. The Court explained that "unjustified restrictions on voir dire concerning the presumption of innocence [cannot be] cured by a general [jury] instruction that the jurors must follow the law as given to them by the [trial] court." Id. (citation omitted).

In State v. Clement, 2 S.W.3d 156, 158-59 (Mo. Ct. App. 1999), the Missouri Court of Appeals held that a trial court erred in declining to ask during *voir dire* whether any prospective jurors would draw an adverse inference from the defendant's decision not to testify. The Court observed that "one specific and critical area of bias and prejudice [that] a [defendant] has a right to uncover during [] voir dire [] is whether a prospective juror will

be prejudiced based on [the] defendant's [decision not] to testify." Id. at 159. The Court explained: "[I]f a criminal defendant is to be able to effectively exercise his or her right not to be compelled to testify at trial, then he or she must be able to inquire of the [prospective juror]s whether they will draw an adverse inference if defendant [decides not] to testify." Id. at 159-60 (citations omitted).

In State v. Lumumba, 601 A.2d 1178, 1189 (N.J. Super. App. Div. 1992), the Appellate Division of the Superior Court of New Jersey held that, during *voir dire*, "[a]t the least, the [prospective jurors] must be asked whether they understand the basic principles of presumption of innocence and [that] the indictment [is not evidence,] and whether they can abide by these principles." The Court agreed with the defendant that, in that case, "*voir dire* did not result in an impartial jury because the trial court . . . did not probe [the prospective jurors] as to their understanding of basic principles [that are] applicable to criminal trials and their ability to abide thereby." Id. at 1187.[6]

---

[6]In State v. Moore, 585 A.2d 864, 877 (N.J. 1991), the Supreme Court of New Jersey held that, in that case, *voir dire* "was sufficiently probing to assure that [the] defendant received a fair trial by an impartial jury"; however, the Court "offer[ed] comments for guidance in future capital trials." Addressing *voir dire* questions concerning the presumption of innocence and the burden of proof, the Court stated:

> Would it not be anomalous in the extreme to allow extensive death-qualification of [prospective] jurors before trial to make sure that they can follow and apply the State's system of capital punishment, yet not to allow defendants a brief, if not cursory, inquiry into [prospective] jurors' attitudes about other fundamentals of the system, such as the presumption of innocence? Perhaps the general orientation of a [jury] panel [] will suffice to convey the essentials, with [prospective] jurors being asked if they have any reservations about their duties as jurors. In the alternative, [trial] courts can administer either a questionnaire or brief inquiry of [prospective] jurors

In <u>Jones v. State</u>, 378 So.2d 797, 798 (Fla. Dist. Ct. App. 1979), a District Court of Appeal of Florida stated that, during *voir dire*,

> counsel must be permitted to inquire of prospective jurors concerning their willingness and ability to accept the [jury instructions] in a criminal case concerning the presumption of innocence, the [S]tate's burden of proof in respect to each element of the offense charged, and the defendant's right not to testify, if the court has not first thoroughly examined the prospective jurors on those subjects.

Consistent with the above-discussed case law from other States, in <u>United States v. Blount</u>, 479 F.2d 650, 651 (6th Cir. 1973), the Sixth Circuit held that a trial court abused its discretion in declining to ask during *voir dire* whether the prospective jurors "could accept the proposition[s] of law that a defendant is presumed to be innocent, has no burden to establish his [or her] innocence, and is clothed throughout the trial with this presumption." The Sixth Circuit explained: "Certainly, a challenge for cause would be sustained if a [prospective] juror expressed his [or her] incapacity to accept the proposition that a defendant is presumed to be innocent despite the fact that he [or she] has been accused in an indictment or information." <u>Id.</u> Subsequently, in <u>United States v. Hill</u>, 738 F.2d 152, 155, 153 (6th Cir. 1984), the Sixth Circuit held that a trial court abused its discretion in declining to ask during *voir dire* questions concerning the burden of proof and the presumption of innocence. The Sixth Circuit observed that, if the trial court had asked

> asking them if they can agree and accept the principles of law as the [trial] court will state them, including that a defendant is innocent until proven guilty and that the State has the defined burden of proving the defendant's guilt.

<u>Id.</u> at 882.

the prospective jurors "whether they could accord the defendants the presumption of innocence and the requirement of proof of guilt beyond reasonable doubt[, a] negative answer[,] or even a hesitant one[,] from any prospective juror would surely have produced a defense challenge" for cause. Id. at 153.

Unlike the Sixth Circuit, other United States Courts of Appeals have determined that, during *voir dire*, a trial court need not comply with a request to ask the prospective jurors whether they are willing and able to follow jury instructions on the presumption of innocence, the burden of proof, and/or the defendant's right not to testify. See United States v. Sherman, 551 F.3d 45, 48, 52 (1st Cir. 2008); United States v. Gillette, 383 F.2d 843, 849 (2d Cir. 1967); Jacobs v. Redman, 616 F.2d 1251, 1255-56 (3d Cir. 1980); United States v. Robinson, 804 F.2d 280, 281 (4th Cir. 1986); United States v. Rodriguez, 993 F.2d 1170, 1176-77 (5th Cir. 1993); United States v. Sababu, 891 F.2d 1308, 1325 (7th Cir. 1989); United States v. Cosby, 529 F.2d 143, 148 (8th Cir. 1976); United States v. Price, 577 F.2d 1356, 1366 (9th Cir. 1978); Grandsinger v. United States, 332 F.2d 80, 81 (10th Cir. 1964); United States v. Miller, 758 F.2d 570, 573 (11th Cir. 1985) (per curiam).

Consistent with these federal cases, in People v. Lambo, 154 N.W.2d 583, 585, 584 (Mich. Ct. App. 1967), the Court of Appeals of Michigan held that a trial court did not abuse its discretion in declining to ask during *voir dire* whether any prospective jurors would treat the defendant's decision not to testify as evidence of guilt. The Court reasoned that certain *voir dire* questions that the trial court asked rendered unnecessary the one that the defendant requested, but acknowledged that, in other States, "[o]ne of the preferred methods is to have the [trial] court briefly outline the rules of law [that are] covered in the

- 28 -

[v]oir dire requests, and then ask the [prospective] jurors if they would and could follow such instructions." Id. at 585 (citation omitted). In Ganas v. State, 537 S.E.2d 758, 762 (Ga. Ct. App. 2000), the Court of Appeals of Georgia held that a trial court did not "abuse its discretion in precluding questions concerning the burden of proof, reasonable doubt, and the presumption of innocence, for these are technical legal questions on which the [trial] court will instruct at the end of trial." (Footnote omitted). In State v. Bitz, 460 P.2d 374, 379, 378 (Idaho 1969), the Supreme Court of Idaho held that a trial court did not abuse its discretion in declining to ask during *voir dire* questions concerning the presumption of innocence, the burden of proof, and the right not to present evidence. The Court pointed out that "[t]he jury is bound by the [jury] instructions[.]" Id. at 379 (citation omitted).

In McCoy v. State, 361 A.2d 241, 243 (Del. 1976), the Supreme Court of Delaware held that a trial court did not abuse its discretion in declining to ask during *voir dire* about the prospective jurors' "views relating to the presumption of innocence and burden of proof[.]" The Court reasoned: "[S]uch matters are best suited for preliminary instruction after the jury is drawn." Id. In Cordero v. United States, 456 A.2d 837, 841 (D.C. 1983), the District of Columbia Court of Appeals held that a trial court did not "abuse its discretion in refusing to ask members of the jury panel whether they would be able to apply the law regarding presumption of innocence, reasonable doubt, and the government's burden of proof." The Court reasoned: "Once jurors are sworn, they are bound to render a verdict under the law as given by the [trial] court, and[,] accordingly, it is not necessary to inquire as to whether a [prospective] juror will refuse to do that which he [or she] swears or affirms [that] he [or she] will do." Id. (cleaned up). In State v. Dahlgren, 512 A.2d 906, 912-13,

915 (Conn. 1986), the Supreme Court of Connecticut held that a trial court did not abuse its discretion in declining defendants' request to ask during *voir dire* questions concerning the burden of proof and the presumption of innocence. The Court reasoned: "The jury is assumed to follow the law as instructed by the trial court." Id. at 915.

In Commonwealth v. Rhoades, 401 N.E.2d 342, 349 (Mass. 1980), the Supreme Judicial Court of Massachusetts held that a trial court did not violate a defendant's constitutional rights by declining to ask during *voir dire* questions concerning the presumption of innocence. The Court reasoned: "Questions [that are] not aimed at revealing racial bias or any similarly indurated and pervasive prejudice are not constitutionally required." Id. (cleaned up). The Court noted that, on appeal, the defendant had not contended that the statute that governed *voir dire* required the trial court to comply with his request. See id. at 349 n.10.

Five years after the Supreme Judicial Court of Massachusetts decided Rhoades, 401 N.E.2d 342, Massachusetts's legislature amended that statute to add the following language:

> In a criminal case[, *voir dire*] shall include questions [that are] designed to learn whether [a prospective] juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilt beyond a reasonable doubt, and that the defendant need not present evidence [o]n his [or her] behalf. If the [trial] court finds that such juror does not so understand, another shall be called in his [or her] stead.

1985 Mass. Laws 706-07 (Vol. I, Ch. 463). Today, substantively identical language remains in effect in Massachusetts. See Mass. Gen. Laws Ann. ch. 234A, § 67A.

**Analysis**

Here, upon consideration of significant developments that have occurred in the fifty-five years since this Court decided <u>Twining</u>, 234 Md. 97, 198 A.2d 291—most importantly, this Court's subsequent holdings that jury instructions as to the law are binding and not advisory only, <u>see</u> <u>Stevenson</u>, 289 Md. at 179-80, 423 A.2d at 565, and <u>Montgomery</u>, 292 Md. at 91, 437 A.2d at 658—we determine that this Court's holding as to *voir dire* questions concerning jury instructions in <u>Twining</u>, 234 Md. at 100, 198 A.2d at 293, is based on outdated reasoning and has been superseded by significant changes in the law. We overrule the holding in <u>Twining</u>, and conclude that, on request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the long-standing fundamental principles of the presumption of innocence, the State's burden of proof, and the defendant's right not to testify.

Although proper in its time fifty-five years ago, today, this Court's holding as to *voir dire* questions concerning jury instructions in <u>Twining</u>, 234 Md. at 100, 198 A.2d at 293, is outdated and no longer good law. <u>Twining</u> does not offer much in the way of analysis as to its holding, and what little reasoning <u>Twining</u> provides is not valid anymore. In <u>Twining</u>, <u>id.</u> at 100, 198 A.2d at 293, this Court identified three reasons for its holding that the trial court did not abuse its discretion in declining to ask whether the prospective jurors "would give the [defendant] the benefit of the presumption of innocence and the burden of proof." First, the jury instructions "fully and fairly covered" the presumption of innocence and the burden of proof. <u>Id.</u> at 100, 198 A.2d at 293. Second, it was "generally recognized that it is inappropriate . . . to question [prospective jurors] as to whether or not

- 31 -

they would be disposed to follow or apply stated rules of law." Id. at 100, 198 A.2d at 293 (citation omitted). Third, at the time, in Maryland, jury instructions were considered "only advisory." Id. at 100, 198 A.2d at 293. All three of these reasons have been essentially vitiated in the decades since this Court decided Twining, including, most significantly, this Court has explicitly overruled the premise that jury instructions are advisory only.

In Twining, id. at 100, 198 A.2d at 293, this Court took the position that jury instructions on the presumption of innocence and the burden of proof obviate the need to ask during *voir dire* whether any prospective jurors would not honor those fundamental rights. To be sure, our case law provides that "[j]urors are presumed to follow the [jury] instructions." Newton v. State, 455 Md. 341, 360, 168 A.3d 1, 12 (2017) (cleaned up). That presumption, however, is itself based on another presumption—namely, that the jurors are willing and able to follow jury instructions. But, in the decades since this Court decided Twining, it has become apparent that not all jurors are willing and able to follow jury instructions on the presumption of innocence and the burden of proof. In the comment to Maryland Criminal Pattern Jury Instruction (2d ed. 2018)[7] 1:00 (Pretrial Introductory Instructions), the Maryland State Bar Association's Standing Committee on Pattern Jury Instructions observed: "[S]tudies have shown that jurors routinely misunderstand or misapply" the presumption of innocence and the burden of proof. (Citing William S.

---

[7]"[T]he pattern jury instructions are drafted by a group of distinguished judges and lawyers who almost amount to a 'Who's Who' of the Maryland [b]ench and [b]ar." Johnson v. State, 223 Md. App. 128, 152, 115 A.3d 668, 682, cert. denied, 445 Md. 6, 122 A.3d 975 (2015) (cleaned up). "This Court has advocated for the close adherence to [the] pattern [jury] instructions in a variety of cases, exhibiting our general support for their use." Armacost v. Davis, 462 Md. 504, 544-45, 200 A.3d 859, 883 (2019) (cleaned up).

Laufer, *The Rhetoric of Innocence*, 70 Wash. L. Rev. 329, 366-67 (1995); Mitchell J. Frank & Dr. Dawn Broschard, *The Silent Criminal Defendant and the Presumption of Innocence: In the Hands of Real Jurors, Is Either of Them Safe?*, 10 Lewis & Clark L. Rev. 237, 250 (2006)).

Both of the law review articles that the Committee relied upon referred to studies that show that multiple actual and mock jurors who were surveyed were unable or unwilling to follow jury instructions on the presumption of innocence and the burden of proof. According to Laufer:

> Studies dating back to the early 1970s have consistently revealed comprehension levels at or below fifty percent for samples of actual and mock jurors for a wide range of [jury] instructions[,] including [jury] instructions on the reasonable doubt rule. For example, researchers found a fifty percent comprehension rate of reasonable doubt [jury] instructions in a study of the Florida Standard Jury Instructions. Less than a third of a sample of Michigan jurors understood that the [State] had the burden of proof. Other studies considering reasonable doubt rule [jury] instructions in a host of jurisdictions find comprehension error rates ranging between twenty percent and fifty percent.

Laufer, 70 Wash. L. Rev. at 365 (footnotes omitted). Similarly, Frank and Dr. Broschard discussed multiple studies of jurors' comprehension of jury instructions, and stated of one of them: "One of the findings in this study is that the adage, 'innocent until proven guilty,' is untrue. For a majority of the jurors, the defendant is guilty until proven innocent." Frank & Dr. Broschard, 10 Lewis & Clark L. Rev. at 248 (footnote omitted).

When this Court decided <u>Twining</u> in 1964, it did not have the benefit of the Committee's observation or the above-discussed studies. In fact, at the time, there had not yet been any "[e]mpirical research on juror comprehension of instructions, [which] was

initiated in the early 1970s." Laufer, 70 Wash. L. Rev. at 364 n.161 (citations omitted).

Tellingly, it was not until 1984 that the Supreme Court of New Hampshire observed that there was "a shockingly widespread ignorance of those valued precepts [that are] most central to our American system of criminal justice[—]a defendant's presumption of innocence and the government's burden of proving guilt beyond a reasonable doubt." Cere, 480 A.2d at 198.

Contrary to this Court's prior reasoning in Twining, 234 Md. at 100, 198 A.2d at 293, jury instructions on the presumption of innocence and the burden of proof are not an effective remedy for a prospective juror who is unwilling or unable to follow such jury instructions. The Supreme Court of Illinois has pointed out that, "[i]f a juror has a prejudice against any of these basic guarantees, a[ jury] instruction [that is] given at the end of the trial will have little curative effect." Zehr, 469 N.E.2d at 1064. And, in the words of the Supreme Court of Louisiana, "unjustified restrictions on voir dire concerning the presumption of innocence [cannot be] cured by a general [jury] instruction that the jurors must follow the law as given to them by the [trial] court." Hayes, 364 So.2d at 924. From our perspective, the problem is that, although jury instructions may inform a juror of a defendant's fundamental rights, jury instructions cannot cure a juror's inability to understand, or unwillingness to follow the instructions. For example, some jurors may be unable to understand that a defendant has a right not to testify because they have "a natural desire to hear all sides of a story[,]" as well as an inclination to be suspicious of a defendant who does not testify. Id. And, some jurors may be adverse to the presumption of innocence because they believe that the circumstance that the defendant has been charged means that

the defendant is likely guilty, and must offer evidence of innocence. See Cere, 480 A.2d at 198. Jury instructions cannot bring a prospective juror's inability to understand, or adversity toward, fundamental rights to the attention of the trial court and the parties—only *voir dire* questions can. See Hayes, 175 S.W.3d at 585. Simply put, if a trial court seats a prospective juror who is unwilling or unable to follow jury instructions on the presumption of innocence and the burden of proof, jury instructions, which are given at the end of trial will be too little, and too late to uncover the basis for disqualification.[8]

In Twining, 234 Md. at 100, 198 A.2d at 293, in addition to pointing out that the trial court had instructed the jury concerning the presumption of innocence and the burden of proof, this Court stated that it was "generally recognized that it is inappropriate" to ask during *voir dire* whether any prospective jurors would be unwilling to follow jury instructions. (Citation omitted). In support of this proposition, this Court did not directly refer to any case law, and instead relied on Section 275(2) on page 1043 of Volume 50 of the 1947 edition of *Corpus Juris Secundum*.[9] See Twining, 234 Md. at 100, 198 A.2d at

---

[8]Indeed, at oral argument, this Court asked the Assistant Attorney General how, in the absence of a *voir dire* question, a prospective juror's unwillingness to follow jury instructions on the presumption of innocence and the burden of proof would come to light. The Assistant Attorney General suggested that the other eleven jurors could send a note to the trial court, pointing out the juror's unwillingness to follow those jury instructions.

[9]*Corpus Juris Secundum*—Latin for "Second Body of Law"—is the latest in a series of three legal encyclopedias. John Henry Merryman, *The Authority of Authority: What the California Supreme Court Cited in 1950*, 6 Stan. L. Rev. 613, 634 (1954). The first in the series was *Cyclopedia of Law and Procedure*, which was first published in 1901. See id. The second in the series was *Corpus Juris*, which was first published in 1914. See id. at 635. Finally, *Corpus Juris Secundum* was first published in 1936. See Merchants Ins. Co. v. Lilgeomont, Inc., 84 F.2d 685, 687 (5th Cir. 1936). The relevant edition of *Corpus Juris Secundum* was published in 1947, and the relevant language is on page 1043. See State v. Camarillo, 678 P.2d 102, 105 (Idaho Ct. App. 1984).

293. The provision stated in pertinent part that a trial "court may and should exclude [*voir dire* questions that] call for [a prospective juror's] understanding of the meaning of legal terms and expressions." People v. Jefferson, 191 P.2d 487, 489 (Cal. Dist. Ct. App. 1948) (citations omitted). Identical language appeared in Section XIIIG7c(I) on page 341 of Volume 24 of the 1907 edition of *Cyclopedia of Law and Procedure*. See The Am. Law Book Co., *Cyclopedia of Law and Procedure* 341 (William Mack, ed., 1907), available at https://www.google.com/books/edition/Cyclopedia_of_Law_and_Procedure/jV0EAQAA IAAJ?hl=en&gbpv=1&pg=PA341&printsec=frontcover [https://perma.cc/2E3M-N98Y]. There, the footnote that follows the above sentence cites three cases, the most recent of which was decided in 1904. See id. at 341 n.48.[10]

The sources referenced above demonstrate that this Court's statement in Twining, 234 Md. at 100, 198 A.2d at 293—namely, that it was "generally recognized that it is inappropriate" to ask during *voir dire* whether any prospective jurors would be unwilling to follow jury instructions—was, even at the time, at best, tenuous. This Court's citation of a 1947 secondary source, which used the same language as a 1907 predecessor, which relied on only a handful of cases, did not effectively establish that the proposition in question was ever "generally recognized"—much less that it was "generally recognized" in 1964 when this Court decided Twining. Id. at 100, 198 A.2d at 293 (citation omitted).

And even if it could be established that the proposition in question was "generally

---

[10]Similarly, in support of the proposition that "a juror is not necessarily disqualified merely because the juror . . . is unfamiliar with the meaning of legal terms and expressions[,]" the latest edition of *Corpus Juris Secundum* cites only one case, which was decided in 1910. See 50A C.J.S. Juries § 291 & n.3 (Oct. 15, 2019) (footnote omitted).

recognized" in 1964, id. at 100, 198 A.2d at 293 (citation omitted), that is not the case now. Courts are currently not in agreement on the issue. As explained above, the Sixth Circuit and several State courts have concluded that, during *voir dire*, a trial court must comply with a request to ask the prospective jurors whether they are willing and able to follow the jury instructions on the presumption of innocence, the burden of proof, and/or the defendant's right not to testify. See Hill, 738 F.2d at 155, 153; Hayes, 175 S.W.3d at 586; Zehr, 469 N.E.2d at 1063-64; Cere, 480 A.2d at 198; Hayes, 364 So.2d at 925, 924; Clement, 2 S.W.3d at 158-59; Lumumba, 601 A.2d at 1189; Jones, 378 So.2d at 798. To be sure, many United States Courts of Appeals and courts in other States and the District of Columbia, have determined that, during *voir dire*, a trial court need not comply with a request to ask the prospective jurors whether they are willing and able to follow the jury instructions on the presumption of innocence, the burden of proof, and/or the right not to testify. The differences in the case law of the various jurisdictions demonstrates that it is not "generally recognized" that asking such questions is inappropriate, if it ever was.

That said, that a *voir dire* question may or may not be permitted in a majority or minority of other jurisdictions is not dispositive of what the best course of action is for this Court to take in Maryland. From our perspective, the Sixth Circuit and the State courts that permit or require the questions have the better part of the argument. Giving, upon request, *voir dire* questions concerning long-standing fundamental rights—*i.e.*, the rights to be presumed innocent, not to testify, and not to be convicted except upon proof of guilt beyond a reasonable doubt—undoubtedly helps to safeguard a defendant's right to be tried by a fair and impartial jury. See Zehr, 469 N.E.2d at 1064; Cere, 480 A.2d at 198; Clement,

2 S.W.3d at 159-60; Lumumba, 601 A.2d at 1187. *Voir dire* questions concerning these fundamental rights are warranted because responses indicating an inability or unwillingness to follow jury instructions give rise to grounds for disqualification—*i.e.*, a basis for meritorious motions to strike for cause the responding prospective jurors, that may not be discovered until it is too late, or may not be discovered at all. See Hayes, 175 S.W.3d at 585; Zehr, 469 N.E.2d at 1064; Hill, 738 F.2d at 153.

The cases holding to the contrary from courts in other jurisdictions are not persuasive. Several of these courts relied, exclusively or almost exclusively, on the reasoning that other jury instructions obviate the need for *voir dire* questions concerning fundamental matters. See Sherman, 551 F.3d at 52; Gillette, 383 F.2d at 849; Jacobs, 616 F.2d at 1255-56; Robinson, 804 F.2d at 281; Sababu, 891 F.2d at 1325; Cosby, 529 F.2d at 148; Price, 577 F.2d at 1366; Grandsinger, 332 F.2d at 81; Miller, 758 F.2d at 573; Ganas, 537 S.E.2d at 762; Bitz, 460 P.2d at 378; McCoy, 361 A.2d at 243; Cordero, 456 A.2d at 841; Dahlgren, 512 A.2d at 915. As explained above, giving jury instructions on the presumption of innocence and the burden of proof is, by definition, not an effective remedy for a prospective juror who is unwilling or unable to follow such jury instructions.

In addition to being required in the Sixth Circuit and several other States, giving *voir dire* questions concerning certain fundamental rights is currently recommended by the Maryland State Bar Association. In the 2018 edition of the Model Jury Selection Questions for Criminal Trials, the Maryland State Bar Association's Special Committee on Voir

Dire[11] recommended asking during *voir dire* whether any prospective jurors cannot honor the presumption of innocence, and noted that, though "not required[,]" that *voir dire* question is "widely used[.]"  MJSQ MD-CLE 1, Question 29 & n.59 (citations omitted). This circumstance is yet another indication that this Court's pronouncement in Twining, 234 Md. at 100, 198 A.2d at 293—that it was "generally recognized that it is inappropriate" to ask during *voir dire* whether any prospective jurors would be unwilling to follow jury instructions—is no longer accurate and that the current prohibition on asking the questions on request is no longer warranted in Maryland courts.

Most significantly, in Twining, id. at 100, 198 A.2d at 293, immediately after stating that it was "generally recognized that it is inappropriate" to ask during *voir dire* whether any prospective jurors would be unwilling to follow jury instructions, this Court reasoned: "This would seem to be particularly true in Maryland, where [jury] instructions are only advisory."  This Court was referring to the circumstance that, at the time, in Maryland, it was common practice for trial courts to tell juries that the jury instructions were "advisory only and not binding[.]"  Vogel, 163 Md. at 269, 162 A. at 705.  In other words, in Twining, 234 Md. at 100, 198 A.2d at 293, this Court took the position that there was no point in determining whether prospective jurors would follow jury instructions, given that jurors were free to disregard jury instructions anyway, *i.e.*, jury instructions were advisory only.

---

[11]In Collins v. State, 452 Md. 614, 630, 632, 158 A.3d 553, 563, 564 (2017), this Court stated: "The [] Model Jury Selection Questions for Criminal Trials provides a flexible script with committee notes as a tool for [trial court]s. . . . We appreciate the good work of the Committee[,] and commend to bench and bar alike a review of the model questions in their entirety."  (Footnote omitted).

Importantly, this is no longer the case. In 1980, in <u>Stevenson</u>, 289 Md. at 178, 423 A.2d at 564, this Court explained that the jury's power to be "the judges of the law" "is limited to deciding the law of the crime, or the definition of the crime, as well as the legal effect of the evidence before the jury." (Cleaned up). This Court stated that a trial court must make clear to a jury that, other than the law of the crime, "all other aspects of law (e.g., the burden of proof, the requirement of unanimity, the validity of a statute) are beyond the jury's pale, and that the [jury instruction]s on these matters are binding upon that body." <u>Id.</u> at 180, 423 A.2d at 565. The following year, in <u>Montgomery</u>, 292 Md. at 91, 437 A.2d at 658, this Court unequivocally held that trial courts cannot tell juries that the jury instructions are advisory only. This Court declared that jury instructions on fundamental rights, such as the presumption of innocence, the burden of proof, and the right not to testify, "are not the law of the crime[, and] they are not advisory[.]" <u>Id.</u> at 91, 437 A.2d at 658 (internal quotation marks omitted).

Consistent with <u>Stevenson</u>, 289 Md. at 180, 423 A.2d at 565, and <u>Montgomery</u>, 292 Md. at 91, 437 A.2d at 658, today, jury instructions about the law are binding and trial courts advise juries as much. Maryland Criminal Pattern Jury Instruction 2:00 (Binding Nature of Instructions) provides:

> Members of the jury, the time has come to explain the law that applies to this case. The instructions that I give about the law are binding upon you. In other words, you must apply the law as I explain it in arriving at your verdict. On the other hand, any comments that I may have made or may make about the facts are not binding upon you and are advisory only. You are the ones to decide the facts and apply the law to those facts.

That jury instructions are no longer advisory only invalidates the rationale that this Court

offered for its holding in Twining, 234 Md. at 100, 198 A.2d at 293, that a trial court may decline a request to ask *voir dire* questions concerning the presumption of innocence and the burden of proof because the instructions are not binding, and unequivocally satisfies the exception to the doctrine of *stare decisis*. Accordingly, this Court's holding in Twining is no longer good law.[12]

Put simply, *voir dire* questions concerning the three long-standing fundamental rights at issue meet the criteria for *voir dire* questions that trial courts must ask on request. In Collins, 463 Md. at 376-77, 205 A.3d at 1014, this Court explained those criteria as follows:

> [O]n request, a trial court must ask a *voir dire* question if and only if the *voir dire* question is reasonably likely to reveal specific cause for disqualification. There are two categories of specific cause for disqualification: (1) a statute disqualifies a prospective juror; or (2) a collateral matter is reasonably liable to have undue influence over a prospective juror. The latter category is comprised of biases that are directly related to the crime, the witnesses, or the defendant.

(Cleaned up). On request, a trial court must ask *voir dire* questions that are reasonably likely to reveal a cause for disqualification involving matters that are liable to have undue influence over a prospective juror. Such matters may be comprised of biases related to the crime or the defendant. Certainly, the belief that a defendant must testify or prove

---

[12]Like Twining, its progeny—Logan, 394 Md. at 399-400, 906 A.2d at 386-87, and Stewart, 399 Md. at 162-63, 923 A.2d at 53-54—are no longer good law with respect to *voir dire* questions concerning fundamental rights. In both Logan and Stewart, this Court did not in any way analyze, as we do today, whether this Court's reasoning in Twining has become outdated in light of significant developments that have occurred since this Court decided Twining.

innocence, or an unwillingness or inability to comply with jury instructions on the presumption of innocence, burden of proof, or a defendant's right not to testify, otherwise would constitute a bias related to the defendant. As a matter of fact, it is difficult to conceive of circumstances that could be more prejudicial to a defendant's right to a fair trial.

All three of the fundamental principles at issue—the burden of proof, the presumption of innocence, and the right not to testify—have existed for more than two centuries. The Fifth Amendment to the Constitution of the United States, which was ratified in 1791, expressly enshrines the right not to testify, stating in relevant part: "No person shall be . . . compelled in any criminal case to be a witness against him[- or her]self[.]" Although the Constitution does not explicitly refer to the burden of proof or the presumption of innocence, both of those principles existed under the common law at least since around the time of the country's founding. See In re Winship, 397 U.S. 358, 361 (1970) (the burden of proof); Coffin v. United States, 156 U.S. 432, 455 (1895) (the presumption of innocence). In Lilienthal's Tobacco v. United States, 97 U.S. 237, 266-67 (1877), a criminal case that involved forfeiture of property, the Supreme Court recognized the burden of proof and the presumption of innocence, stating:

> In criminal cases[,] the true rule is that the burden of proof never shifts; that[,] in all cases, before a conviction can be had, the jury must be satisfied from the evidence, beyond a reasonable doubt, of the affirmative of the issue presented in the accusation that the defendant is guilty in the manner and form as charged in the indictment.

* * *

- 42 -

> Innocence is presumed in a criminal case until the contrary is proved; or, in other words, reasonable doubt of guilt is[,] in some cases[,] of the kind ground of acquittal, where, if the probative force of the presumption of innocence were excluded, there might be a conviction[.]

(Citations omitted).

Because these long-standing fundamental rights are critical to a fair jury trial in a criminal case, on request, a defendant should be entitled to *voir dire* questions that are aimed at uncovering a juror's inability or unwillingness to honor these fundamental rights. By making such *voir dire* questions mandatory on request, we help ensure that a juror's inability or unwillingness to follow instructions involving these three important fundamental rights will be discovered before trial, and that all defendants—not just ones whose trials are presided over by circuit court judges who chose to exercise the discretion to grant requests to ask such *voir dire* questions—will have the opportunity to move to strike prospective jurors for cause on the ground of an unwillingness or inability to adhere to these fundamental rights.

Just as we do not disturb case law as to *voir dire* questions concerning jury instructions other than those on the presumption of innocence, the burden of proof, and the right not to testify, we continue to stand by the well-established principle that "Maryland employs limited *voir dire*—that is, in Maryland, *voir dire*'s sole purpose is to elicit specific cause for disqualification, not to aid counsel in the intelligent use of peremptory strikes." Collins, 463 Md. at 404, 205 A.3d at 1030 (footnote omitted). We require *voir dire* questions concerning the three fundamental rights at issue because they could elicit responses that would give rise to meritorious motions to strike the responding prospective

jurors for cause—*i.e.*, grounds for disqualification—not because such responses could aid counsel in the intelligent use of peremptory strikes.

We point out that a trial court is not required, on its own initiative, to ask *voir dire* questions concerning fundamental rights. Instead, a trial court must ask such *voir dire* questions only if a defendant requests them. This is consistent with prior cases in which this Court has required trial courts to grant requests to ask certain *voir dire* questions, as opposed to requiring trial courts to ask those *voir dire* questions *sua sponte*. See, e.g., Washington v. State, 425 Md. 306, 315, 40 A.3d 1017, 1022 (2012); Pearson, 437 Md. at 354, 86 A.3d at 1234. Additionally, consistent with this Court's case law, we provide Kazadi with the benefit of the holding in this case, and we determine that our holding applies to this case and any other cases that are pending on direct appeal when this opinion is filed, where the relevant question has been preserved for appellate review. See Hackney v. State, 459 Md. 108, 119, 184 A.3d 414, 421 (2018); State v. Daughtry, 419 Md. 35, 77 n.26, 18 A.3d 60, 85 n.26 (2011).

A trial court is not required to use any particular language when complying with a request to ask during *voir dire* whether any prospective jurors are unwilling or unable to comply with the jury instructions on the presumption of innocence, the burden of proof, and the defendant's right not to testify. The questions should concisely describe the fundamental right at stake and inquire as to a prospective juror's willingness and ability to

follow the trial court's instruction as to that right. This is all that need occur.[13]

For the above reasons, this Court's holding in <u>Twining</u>, 234 Md. at 100, 198 A.2d at 293, is overruled. On request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the presumption of innocence, the burden of proof, and the defendant's right not to testify. We reverse the judgment of the Court of Special Appeals.

## II. Immigration-Related Information[14]

### The Parties' Contentions

Kazadi contends that the circuit court erred in denying the motion to compel the State to disclose S.L.'s Alien Registration Number, immigration case number, and the deportation order to which S.L. and M.L. were subject, and that the circuit court erred in failing to allow his counsel to cross examine S.L. and M.L. concerning their immigration status. Kazadi argues that, without the requested information, it was impossible to determine S.L.'s or M.L.'s character for untruthfulness. Kazadi asserts that, although the State represented that it had not given S.L. any special treatment in exchange for her testimony, there may have been information that was related to the deportation order that

---

[13]We note that the above example of *voir dire* questions do not run afoul of the prohibition on compound *voir dire* questions. A compound *voir dire* question "essentially combines two questions: one regarding whether the prospective juror" has a bias; "and, if so, one regarding whether [that bias] would make it difficult for the prospective juror to be fair and impartial." <u>Collins</u>, 463 Md. at 377, 205 A.3d at 1014-15. The *voir dire* questions at issue do not call for a prospective juror to assess whether he or should could be fair and impartial.

[14]Although our resolution of the issue as to *voir dire* necessitates a new trial, we address the issues as to immigration-related information because they are likely to recur at trial.

bore on S.L.'s or M.L.'s bias, prejudice, interest, or motive. Kazadi maintains that other courts have concluded that unlawful entry into the United States or other violations of immigration laws are *per se* relevant to a witness's character for untruthfulness.

The State responds that the circuit court properly exercised its discretion in denying the motion to compel, and that the circuit court properly restricted Kazadi's cross-examination of S.L. and M.L., because immigration status is not relevant to credibility. The State contends that none of the information that Kazadi requested fell within the scope of the State's discovery obligations. The State argues that it was not obligated to procure immigration-related information from its witnesses or the federal government in an attempt to facilitate Kazadi's speculative search for impeachment material. The State maintains that, because the prosecutor, S.L., and M.L. indicated that there was no *quid pro quo* in exchange for testimony against Kazadi, there was no reasonable likelihood that the requested information would lead to impeachment material.

## Standard of Review

An appellate court reviews without deference a trial court's conclusion as to whether a discovery violation occurred. See Cole v. State, 378 Md. 42, 56, 835 A.2d 600, 607 (2003). An appellate court reviews without deference a trial court's restriction of cross-examination where that restriction is based on the trial court's "understanding of the legal rules that may limit particular questions or areas of inquiry." Peterson v. State, 444 Md. 105, 124, 118 A.3d 925, 935 (2015).

## Discovery and Impeachment

Maryland Rule 4-263 governs discovery in a criminal case in a circuit court.

Maryland Rule 4-263(d)(6) states in pertinent part:

> Without the necessity of a request, the State's Attorney shall provide to the defense . . . [a]ll material or information in any form, whether or not admissible, that tends to impeach a State's witness, including:
>
> (A) evidence of prior conduct to show the character of the witness for untruthfulness pursuant to Rule 5-608(b); [and]
>
> (B) a relationship between the State's Attorney and the witness, including the nature and circumstances of any agreement, understanding, or representation that may constitute an inducement for the cooperation or testimony of the witness[.]

Maryland Rule 5-608(b) governs impeachment of a witness through conduct that did not result in a conviction, which is commonly known as "other crimes and prior bad acts[.]" Ford v. State, 462 Md. 3, 36, 197 A.3d 1090, 1109 (2018) (citation omitted). Maryland Rule 5-608(b) states in its entirety:

> The court may permit any witness to be examined regarding the witness's own prior conduct that did not result in a conviction but that the court finds probative of a character trait of untruthfulness. Upon objection, however, the court may permit the inquiry only if the questioner, outside the hearing of the jury, establishes a reasonable factual basis for asserting that the conduct of the witness occurred. The conduct may not be proved by extrinsic evidence.

Maryland Rule 5-616(a) governs the topics of questions that counsel may ask to impeach a witness. Maryland Rule 5-616(a)(4) states: "The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at . . . [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]"

**Immigration Status**

In Carrero-Vasquez v. State, 210 Md. App. 504, 519-20, 516, 63 A.3d 647, 657, 655

(2013), the Court of Special Appeals held that a trial court erred in precluding a defendant from cross-examining a State's witness about her immigration status. In that case, the defendant borrowed the witness's vehicle, and law enforcement officers initiated a traffic stop, searched the vehicle, and found a stolen handgun. See id. at 508-09, 63 A.3d at 650. At trial, the defendant pursued the defense that the witness put the handgun in her vehicle. See id. at 513, 63 A.3d at 653. The witness denied doing so. See id. at 517, 63 A.3d at 655. There was no forensic evidence that linked the defendant to the handgun, and the witness's testimony was the only evidence that the defendant put the handgun in her vehicle. See id. at 513, 63 A.3d at 653. During the witness's cross-examination, the witness acknowledged being an undocumented immigrant, and that being convicted of possessing a stolen handgun would be grounds for deportation. See id. at 516, 63 A.3d at 654. Before a second trial in the case, the State filed a motion to preclude the defendant from cross-examining the witness about her immigration status, which the trial court granted. See id. at 516, 63 A.3d at 654-55. A jury found the defendant guilty of multiple crimes, and he appealed. See id. at 508, 63 A.3d at 650.

The Court of Special Appeals reversed and remanded for a new trial. See id. at 508, 63 A.3d at 650. The Court explained that, due to the witness's testimony at trial, there was a factual basis for cross-examining her about her immigration status at the second trial. See id. at 527, 63 A.3d at 661. The Court concluded that the witness's immigration status was not a collateral issue because fear of deportation may have been a "material reason[] why she may have been motivated to lie under oath[.]" Id. at 522, 63 A.3d at 658.

In Ayala v. Lee, 215 Md. App. 457, 481, 81 A.3d 584, 599 (2013), the Court of

Special Appeals held that plaintiffs "opened the door to questions about their immigration status when their answers to interrogatories differed substantively from documents they later submitted as evidence." (Cleaned up). In that case, the plaintiffs, who were undocumented immigrants, sued the defendants in connection with a motor vehicle accident. See id. at 461-62, 463, 81 A.3d at 587, 588. In answers to interrogatories, the plaintiffs "indicated that they were legally permitted to work in the United States"; also, the plaintiffs provided copies of their federal tax returns, showing Social Security Numbers that were purportedly assigned to them. Id. at 481-82, 81 A.3d at 599. But, the plaintiffs "later submitted copies of applications for asylum that stated that they were neither United States citizens nor legal residents." Id. at 482, 81 A.3d at 599. The plaintiffs filed a motion to exclude evidence of their immigration status, which the trial court denied. See id. at 463, 81 A.3d at 588. A jury found in the defendants' favor, and the plaintiffs appealed. See id. at 462, 81 A.3d at 587.

The Court of Special Appeals reversed and remanded for a new trial on the separate issue of damages. See id. at 466, 81 A.3d at 590. The Court of Special Appeals concluded that, at the new trial, if the plaintiffs chose to testify, "their credibility [could] be challenged with questions asking them about [the] apparently inconsistent statements" regarding their immigration status. Id. at 482, 81 A.3d at 599. That said, the Court of Special Appeals acknowledged:

> **Immigration status alone does not reflect upon an individual's character[,] and is thus not admissible for impeachment purposes.** *See Figeroa v. U.S. I.N.S.*, 886 F.2d 76, 79 (4th Cir. 1989) ("An individual's status as an alien, legal or otherwise, however does not entitle the [government] to brand him a liar."); *Galaviz-Zamora*[ *v. Brady Farms, Inc.*],

- 49 -

230 F.R.D. [499,] 502 [(W.D. Mich. 2005)] (finding no connection between immigration status and witness credibility); *Mischalski v. Ford Motor Co.*, 935 F. Supp. 203, 207-08 (E.D.N.Y. 1996) (no support for "the conclusion that the status of being an illegal alien impugns one's credibility"). Immigration violations that involve false statements, such as false employment papers, are more likely to be relevant, but are still subject to an intensive inquiry into the likelihood of prejudice, as discussed above. *See Serrano*[ *v. Underground Utils. Corp.*], 970 A.2d [1054,] 1070 [(N.J. Super. App. Div. 2009)] (observing that the likelihood of evidence of "employment-related false statements" leading to "other witnesses who could offer negative opinions or reputation testimony about plaintiffs' truthfulness" that would be admissible seems exceedingly low). Further, the relevance of an immigration-related false statement, standing on its own, is limited if the party against whom it is offered is not charged with an immigration-related[] crime. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 241-42 (Tex. 2010) (The collateral matter of defendant's immigration status was inadmissible impeachment evidence because it served only to "contradict [the defendant] on facts irrelevant to issues at trial").

Ayala, 215 Md. App. at 480-81, 81 A.3d at 598-99 (emphasis added) (some alterations in original).

## Analysis

Here, we conclude that, absent additional circumstances—such as allegations of *quid pro quo* or leniency in an immigration case giving rise to a motive to testify falsely or bias—a State's witness's status as an undocumented immigrant, or the existence of a deportation order to which the witness may be subject does not "show the character of the witness for untruthfulness[,]" Md. R. 4-263(d)(6)(A), is not "probative of a character trait of untruthfulness[,]" Md. R. 5-608(b), and does not show that the witness "has a motive to testify falsely[,]" Md. R. 5-616(a)(4). Without more, a State's witness's status as an undocumented immigrant, or any deportation order to which the person is subject, is not required to be disclosed by a prosecutor during discovery, and is not a proper subject of

cross-examination.

To be discoverable under Maryland Rule 4-263(d)(6)(A), information must be relevant to a State's witness's credibility. Generally, a witness's immigration status is not relevant to his or her credibility because, absent additional circumstances, a witness's status as an undocumented immigrant, or the existence of a deportation order to which the witness may be subject, does not make the witness any more likely to falsely testify than any person would be. We agree with the Court of Special Appeals and multiple other courts that "[i]mmigration status alone does not reflect upon an individual's character[,] and is thus not admissible for impeachment purposes." Ayala, 215 Md. App. at 480, 81 A.3d at 598 (citations omitted).

We do not adopt Kazadi's contention that a prosecutor must disclose a deportation order to which a State's witness is subject because the deportation order could reveal evidence of the use of "falsehoods to enter or remain in the country." It is purely speculative to assert that a deportation order resulted from falsehoods or misrepresentations that were associated with illegal entry or overstaying.

Applying our conclusion to the facts of this case, we determine that the circuit court correctly denied the motion to compel the State to disclose S.L.'s Alien Registration Number, her immigration case number, and any paperwork concerning her immigration status, including a copy of the deportation order to which she was subject. Additionally, the circuit court was correct in precluding Kazadi's counsel from cross-examining S.L. and M.L. about their immigration status, and about the deportation order to which S.L. was subject. There is no evidence of any *quid pro quo* or leniency in any immigration matter

involving S.L. or M.L. There is no indication that any of the immigration-related information that Kazadi requested would "show the character of [S.L.] for untruthfulness[.]" Md. R. 4-263(d)(6)(A). Because there was no evidence that S.L.'s or M.L.'s immigration status, or the deportation order, reflected on their credibility, disclosure of the requested documents was not required and cross-examination regarding the same was not permitted. On remand, absent any additional information, as was the case at the first trial, the circuit court should not require disclosure of the requested documents and should preclude such cross-examination.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND TO THAT COURT FOR A NEW TRIAL. MAYOR AND CITY COUNCIL OF BALTIMORE TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**

| TSHIBANGU KAZADI | * | IN THE |
| --- | --- | --- |
| *Petitioner* | * | COURT OF APPEALS |
| v. | * | OF MARYLAND |
| STATE OF MARYLAND | * | No. 11 |
| *Respondent* | * | September Term, 2019 |

# O R D E R

Upon further consideration of <u>Tshibangu Kazadi v. State</u>, No. 11, Sept. Term, 2019, 2020 WL 398840 (Md. Jan. 24, 2020), it is this <u>2nd</u> day of March, 2020,

**ORDERED**, by the Court of Appeals of Maryland, a majority of the Court concurring, that the last two sentences of the first full paragraph on page 44 of the opinion are replaced with the following sentence:

> Additionally, consistent with this Court's case law, we provide Kazadi with the benefit of the holding in this case, and we determine that our holding applies to this case and any other cases that are pending on direct appeal when this opinion is filed, where the relevant question has been preserved for appellate review. <u>See</u> <u>Hackney v. State</u>, 459 Md. 108, 119, 184 A.3d 414, 421 (2018); <u>State v. Daughtry</u>, 419 Md. 35, 77 n.26, 18 A.3d 60, 85 n.26 (2011).

/s/ Mary Ellen Barbera
Chief Judge

Circuit Court for Baltimore City
Case No. 116042016
Argued: October 7, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2019

_____

TSHIBANGU KAZADI

v.

STATE OF MARYLAND

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Wilner, Alan M. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by McDonald, J., dissenting in part,
which Hotten and Getty, JJ., join.

_____

Filed: January 24, 2020

In this case, a jury selected in compliance with the well-established voir dire process in Maryland convicted Mr. Kazadi of the murder of Brandon Smith. The Majority Opinion reverses Mr. Kazadi's murder conviction because, in its view, the trial judge abused his discretion by not asking prospective jurors about certain legal principles governing criminal trials that would be covered in the court's jury instructions at the end of the trial.[1] As the Majority Opinion appears to concede, the new rule established in this case not only departs from Maryland precedent, but is contrary to the rule in the majority of state courts and, except for the Sixth Circuit, all federal courts that have addressed the issue. *See* Majority slip op. at 28-30.

I would decide this issue differently. It is well-established that, under Maryland law, the scope of inquiry during *voir dire* to assess the eligibility of jurors is committed to the "sound discretion" of the trial judge. *Stewart v. State*, 399 Md. 146, 160 (2007). Accordingly, as the Majority Opinion correctly states, an appellate court reviews a trial court's decision as to what questions to ask during jury selection under an abuse of discretion standard. Majority slip op. at 17. In my view, it is perfectly acceptable if a trial judge chooses, in the exercise of that discretion, to include *voir dire* questions directed to concepts like reasonable doubt and the presumption of innocence. That is essentially the approach set out in Maryland State Bar Association, Model Jury Selection Questions for Maryland Criminal & Civil Trials (2018), at p. 30. However, I do not agree that the trial

---

[1] Many trial judges also instruct the jury on those principles as part of the court's introductory remarks at the outset of the trial. *See* 1 David E. Aaronson, Maryland Criminal Jury Instructions and Commentary, §1.01 (2018 ed.).

judge's discretion should be constrained by making those questions a mandatory topic of *voir dire*.  It is only another short step to also making mandatory *voir dire* questions concerning the elements of the offenses that the jury will consider, key defenses, and other topics that will be covered in the trial court's instructions.  It could reasonably be argued that a *voir dire* question about "reasonable doubt" in the abstract cannot yield an intelligible response if it is not tethered to some specific statement of *what* must be shown beyond a reasonable doubt.

There is a certain irony in the Majority Opinion.  It endorses the idea that there is only "limited *voir dire*" in Maryland – *i.e.*, that the purpose of *voir dire* in a Maryland trial court is *solely* to identify prospective jurors who should be struck for cause and "not to aid counsel in the intelligent use of peremptory strikes."  Majority slip op. at 43.  However, the new mandatory *voir dire* questions established by the Majority Opinion are not required by those jurisdictions, such as the federal courts, that allow a broader *voir dire* process addressed to the exercise of peremptory strikes as well as strikes for cause.

In addition, certain qualifications to the new rule adopted by the Majority Opinion reveal that the new mandatory *voir dire* questions may not be as critical as the Majority Opinion suggests.  For example, the Majority Opinion does not contemplate that trial judges will always ask these questions, but rather only if requested to do so by a defendant.  Majority slip op. at 44.  Moreover, while Mr. Kazadi's conviction is being reversed for the failure to ask such questions, other convicted defendants whose contemporaneous trials did not include such *voir dire* questions during jury selection are afforded no relief.  *Id*.

2

Clearly, the Majority Opinion is comfortable that these questions are not indispensable to selecting a fair-minded impartial jury, either in the future or in the past.

To reverse a trial court decision for abuse of discretion requires, according to a description frequently quoted by Maryland courts, that "[t]he decision under consideration has to be *well removed from any center mark* imagined by the reviewing court and *beyond the fringe* of what that court deems minimally acceptable," not whether the appellate court would have made a different decision. *North v. North*, 102 Md. App. 1, 14 (1994) (emphasis added). It seems very odd to say that a trial judge who conducted the jury selection process by following Maryland appellate precedent, not to mention the prevailing rule in other jurisdictions, acted in a way "well removed from any center mark" and "beyond the fringe."

In the end, it seems that reversal of a murder conviction that would otherwise be affirmed, in which the trial judge conducted *voir dire* in compliance with the existing law, and in which there is no indication that the jury was other than fair and impartial, is an unwieldy and unnecessary way to modify the *voir dire* process in Maryland state courts. If we believe that it is a good idea to mandate new questions for *voir dire*, we should do so by a rule that would apply to all like cases simultaneously rather than by reversal of one murder conviction.[2]

---

[2] When the Majority Opinion was originally issued, it applied its holding only to Mr. Kazadi's case. It has subsequently been revised to apply to other cases pending on direct review. If one accepts the rationale of the Majority Opinion, that is a fairer result, as it treats like cases alike. In my view, however, it also demonstrates the questionable reasoning of the Majority Opinion – which now effectively holds that an unknown number

Judge Hotten and Judge Getty have authorized me to state that they join in this opinion.

---

of trial judges each abused his or her discretion and committed reversible error when they each failed to anticipate that this Court would adopt, by adjudication, new mandatory *voir dire* questions not required by most other jurisdictions.

Circuit Court for Baltimore City
Case No. 116042016
Argued: October 7, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 11

September Term, 2019

_____

TSHIBANGU KAZADI

v.

STATE OF MARYLAND

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Wilner, Alan M. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Getty, J., dissenting in part,
which McDonald and Hotten, JJ., join.

_____

Filed: January 24, 2020

I respectfully dissent from the Majority's conclusion that *voir dire* questions concerning a jury's willingness to follow a trial court's subsequent instructions on the law are mandatory. I join Judge McDonald's dissent and write separately to further explain my disagreement with the Majority's interpretation of *Twining v. State*, 234 Md. 97 (1964). I would hold that questions regarding a jury's willingness to follow basic legal principles during *voir dire* are not mandatory and a trial court does not abuse its discretion in declining to ask such questions. The Majority misconstrues this Court's basis for our holding in *Twining* and fails to demonstrate how that holding is "clearly wrong and contrary to established principles[, or] has been superseded by significant changes in the law or [the] facts." Majority Slip. Op. at 22 (quoting *Wallace v. State*, 452 Md. 558, 582 (2017)). In my view, the circuit court did not abuse its discretion by declining to ask Mr. Kazadi's requested *voir dire* questions because *Twining* and its progeny remain good law.

In *Twining*, this Court considered whether a trial court's refusal to grant two requested jury instructions constituted an abuse of discretion. 234 Md. at 99–100. The latter refusal is relevant to the instant case. *Id.* at 100. Specifically, Twining sought to inquire whether prospective jurors would "give the accused the benefit of the presumption of innocence and the burden of proof." *Id.* We found no abuse of discretion and dispensed of the issue in a single paragraph:

> The [second] question sought to be propounded [by the trial court] related to whether the [jury] would give the accused the benefit of the presumption of innocence and the burden of proof. We find no abuse of discretion here. The rules of law stated in the proposed questions were fully and fairly covered in subsequent instructions to the jury. It is generally recognized that it is inappropriate to instruct on the law at this stage of the case, or to question the jury as to whether or not they would be disposed to follow or apply stated

rules of law. *See* 50 C.J.S.Juries § 275(2). **This would seem to be particularly true in Maryland, where the courts' instructions are only advisory**. . . .

*Twining*, 234 Md. at 100 (emphasis added).

The Majority reads this paragraph to state three reasons for the Court's holding. Majority Slip. Op. at 31–32. I only discern two reasons. First, Twining's proposed *voir dire* questions were "fully and fairly covered" in the subsequent jury instructions. Second, it is "inappropriate" to question the jury about legal principles during *voir dire*. The *Twining* Court did not, as the Majority concludes, rely on the advisory nature of jury instructions as a basis for its holding. That language amounts only to dicta. Instead, we referenced the lack of binding jury instructions because it only fortified our decision on the first two bases. *Twining*, 234 Md. at 100 ("This would seem to be **particularly true** in Maryland. . . .") (emphasis added).

As described comprehensively in the majority opinion, a court's instructions on the law only became binding upon a jury in the early 1980s. Majority Slip. Op. at 40. *See Stevenson v. State*, 289 Md. 167, 180 (1980); *Montgomery v. State*, 292 Md. 84, 91 (1981). In the decades after this Court decided *Twining*, and since jury instructions became binding, we have reaffirmed the notion espoused in *Twining* that it is improper to question jurors on principles of law during *voir dire*. In *State v. Logan*, the issue concerned whether a trial court had properly refused *voir dire* questions about a juror's willingness to accept a defense of not criminally responsible. 394 Md. 378, 384 (2006). This Court concluded that one proposed question "amount[ed] to a solicitation of whether prospective jurors

2

would follow the court's instructions on the law,"[1] and found no abuse of discretion in the trial court's refusal to ask it. *Id*. at 398–99. We concluded that asking jurors if they would follow the court's instructions on the law, during *voir dire*, is "generally disfavored in Maryland. . . ." *Id*. at 399 (quoting *Twining*, 234 Md. at 100). The *Logan* Court similarly found no abuse of discretion with regard to another proposed *voir dire* question.[2] We explicitly relied on *Twining* for the proposition that "*voir dire* is not the appropriate time for the trial judge to instruct the jury on the law applicable to the case." *Id*. at 400. (Citation omitted).

Yet again in *Stewart v. State*, we noted that "questions asking whether prospective jurors would follow the court's instructions on the law are disfavored in Maryland and a court does not abuse its discretion in refusing to ask them." 399 Md. 146, 162–63 (2007) (citing *Logan*, 394 Md. at 399). To now rely on the fact that jury instructions are binding as a "significant change[] in the law" is improper. The Majority offers no persuasive argument as to how our post-1981 decisions in *Logan* and *Stewart* can now be overruled without violating fundamental principles of *stare decisis*.

I would not overrule *Twining*. I agree with the Majority to the extent that the language the Court used in *Twining*–"[i]t is generally recognized that it is inappropriate to instruct on the law at this stage of the case, or to question the jury as to whether or not they

---

[1] "[I]f the defendant satisfies his burden in this regard, will any member of the jury be unable to find the defendant not criminally responsible?" *Logan*, 394 Md. at 398.

[2] "[D]oes any juror anticipate having difficulty following the Court's instructions on the defense of 'not criminally responsible,' particularly in view of the crimes charged in the indictment?" *Logan*, 394 Md. at 399.

3

would be disposed to follow or apply stated rules of law"–is now antiquated. However, while I agree that such language is outdated, I maintain that the proposed *voir dire* questions regarding a juror's willingness to follow purely legal principles should not be mandatory at defense counsel's request given the circuit court's broad discretion. *See Stewart v. State*, 399 Md. 146, 160 (2007) ("The manner of conducting *voir dire* and the scope of inquiry in determining the eligibility of jurors is left to the sound discretion of the judge."). Therefore, I would affirm the judgment of the Court of Special Appeals.

I would hold that the circuit court did not abuse its discretion in refusing to ask Mr. Kazadi's requested questions. The Majority's opinion paves the way toward creating a patchwork of mandatory *voir dire* questions. I believe this will serve to only complicate the *voir dire* process, confuse trial judges in the exercise of their broad discretion, and lead courts astray from the purpose of limited *voir dire*, which is to solely identify jurors who should be struck for cause, "not to aid counsel in the intelligent use of peremptory strikes." Majority Slip. Op. at 44.

Judge McDonald and Judge Hotten have authorized me to state that they join in this opinion.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/11a19cn.pdf

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/11a19cn2.pdf